```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
ALEXANDER PROUT,                         :
                                         :
                                         :    18 Civ. 260 (JSR)
        Plaintiff,                       :
                                         :    OPINION AND ORDER
        -v-                              :
                                         :
ANNE C. VLADECK & VLADECK, RASKIN,       :
& CLARK, P.C.,
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/11/18

```
        Defendants.
----------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Before the Court are the motions of defendants to dismiss
the Second Amended Complaint and to disqualify Sanford Heisler
Sharp, LLP ("Sanford Heisler") as counsel for plaintiff
Alexander Prout. ECF Nos. 15, 18, 23, 37. Prout brings claims
for legal malpractice and breach of fiduciary duty against
individual defendant Anne C. Vladeck and against Vladeck &
Vladeck, Raskin, Clark, P.C. (the "Vladeck Firm"). He alleges
that defendants agreed to represent him in a dispute with his
then-employer, Invesco, Ltd., advised him to reject a settlement
offer of over $1 million in favor of litigation, and then failed
to file any claims on Prout's behalf or otherwise preserve those
claims. Prout contends that, as a result, the statutes of
limitations applicable to his claims under the Family and
Medical Leave Act and the Sarbanes-Oxley Act lapsed and he was

1

forced to settle for substantially less than he could have received but for defendants' alleged misconduct. Prout also alleges that defendants have refused to return the $5,000 retainer fee he paid and failed to produce their file relating to his case.

**BACKGROUND**

Prout filed the instant action on January 11, 2018. ECF No. 1. Defendants filed motions to dismiss the complaint and to disqualify Sanford Heisler as counsel on March 21, 2018. ECF Nos. 15, 18. In response, Prout amended his complaint. ECF No. 21. The Court accordingly granted defendants leave to file a supplemental memorandum in support of their motion to dismiss (now deemed to be a motion to dismiss the amended complaint), which they did. ECF No. 23. At a hearing on defendants' motions held on May 1, 2018, counsel for plaintiff informed the Court that plaintiff was barred, under the terms of his settlement agreement with Invesco, Ltd. ("Invesco"), from advancing certain allegations supporting his claims absent a court order. See ECF No. 34 at 21:19-23:5. The Court therefore ordered Prout to file a Second Amended Complaint by no later than May 8 that included all allegations necessary to support his claims, including those allegations that he would otherwise be barred from disclosing under the terms of his settlement agreement. See id. at 34:4-6;

2

ECF No. 31. Following Prout's filing of the Second Amended Complaint, see ECF No. 32, both parties submitted additional briefing on defendants' motion to dismiss (now deemed to be addressed to the Second Amended Complaint), see ECF Nos. 37, 40, 43.

The pertinent factual allegations, drawn from the Second Amended Complaint and viewed in the light most favorable the plaintiff, are as follows:

## I. Prout's Employment at Invesco, Ltd.

Plaintiff Alexander Prout worked for Invesco, a financial services firm, from 2003 to 2014. Second Amended Complaint ("Second Am. Compl.") at ¶ 11, ECF No. 32. Throughout his time there, Prout received an annual compensation of approximately $1.5 million, including an annual salary of $436,000 and a bonus (in stock and cash) of approximately $1.1 million. Prout also received benefits such as a life insurance policy, health insurance, and a housing allowance (valued at approximately $10,000 per month). Id. at ¶ 76.

Prout first served as the CEO of Invesco Japan, in which capacity he reported to Andrew Lo, Invesco's Senior Managing Director of Asia Pacific. Id. at ¶¶ 11, 14. During Prout's tenure as CEO, Invesco Japan's Sourced Revenue increased more than 600%; its Managed Revenue increased 300%; and its Assets Under Management grew from $2.4 billion to $28 billion. Id. at ¶

3

14. In addition, the office expanded from 55 to 160 employees. Id.

In March 2011, an earthquake hit Japan. Id. at ¶ 15. After learning that nuclear material had leaked and that his daughters' school in Tokyo would not reopen for the remainder of the school year, Prout moved his family to the United States. Id. Prout himself remained in Japan to "stabilize the business" until Invesco could hire a replacement for him. Id. Eighteen months later, Invesco hired Alex Sato as the CEO of Invesco Japan. Id. at ¶ 16.

Prout agreed to remain at Invesco Japan, as Chairman, to oversee the operation. Id. He served in this role from the fall of 2012 until August 2013. Id. As Chairman, Prout worked on Invesco's global business strategy and maintained offices at Invesco's Atlanta headquarters, which were a relatively short commute from his family, who were then based in Naples, Florida. Id. However, since Prout continued to spend significant amounts of time in Asia, he and his family decided that his wife and youngest daughter would move to Hong Kong in the summer of 2013, while his second daughter, Chessy, would attend the St. Paul's School in New Hampshire, which Prout's oldest daughter already was attending, beginning in the fall of 2013. Id. at ¶¶ 16-17.

In the summer of 2013, Prout began his third, and final, role at Invesco as the company's Managing Director and Regional

Head of Institutional Business. In this role, he again reported to Andrew Lo. Id. at ¶ 17.

According to Prout, two incidents in 2014 helped put an end to his career at Invesco. First, in April 2014, Prout learned that Sato had purchased a $4,000 bottle of wine for a senior executive of Japan Post Bank – a quasi-governmental institution in Japan – during a dinner in New York City. Id. at ¶¶ 12, 18. Prout also learned that Sato had bragged about having paid for the wine from his personal account – "seemingly to throw off any internal investigation." Id. at ¶ 18. Moreover, following Sato's purchase, Invesco received additional sales from Japan Post Bank. Id.

Concerned that this gift from an employee of Invesco (a publicly traded company) to a foreign official violated the Foreign Corrupt Practices Act, Prout reported the incident to Asha Balachandria, Head of Legal for Invesco Asia Pacific. Id. at ¶ 19. After making the report, Prout asked Balachandria how he should escalate his concern. In response, she laughed and said, "You know that if you report to Andrew [Lo] he'll shit on your head." Id. at ¶ 20. Prout nonetheless reported the violation to Lo, whose response "was, effectively, 'So what?'" Id. at ¶ 21. Lo thereafter became "increasingly hostile" toward Prout. Id.

Second, in late May 2014, Prout flew from Hong Kong to New Hampshire for his oldest daughter's graduation from St. Paul's. Id. at ¶ 24. That weekend, a male student raped Prout's second daughter, Chessy, who at that time was also a student at the school. Id. Prout informed Mary Wang, Invesco's Regional Head of Human Resources based in Hong Kong, that he would need to remain in the United States to care for his daughter who had been sexually assaulted. Id. He used vacation and personal days to take this leave, continuing to perform some work remotely and remaining in regular contact with Lo and his colleagues. Id.

A few weeks later, Lo demanded that Prout return to Hong Kong for a meeting to be held in late June. Id. at ¶ 25. Prout did so. Id. Prior to the meeting, Lo became "irate" about formatting issues in a report that they were planning to discuss at the meeting. Id. Prout explained that the content was correct and that the formatting could be corrected before the meeting. Id. Nevertheless, Lo cancelled the meeting and stormed off. Id.

Approximately an hour later, Prout approached Lo and explained the reason for his leave. Id. at ¶ 26. In response, Lo said, "I certainly hope Chessy learns better judgment in the future." Id. Prout raised these comments with Wong, who apologized for Lo's behavior, stating that Lo is not a "family man" and doesn't have daughters. Id. For the remainder of the summer, Prout cared for his daughter in the United States while

6

working remotely and staying in regular contact with his team in
Hong Kong. Id.

## II.   Defendants' Representation of Prout

On May 13, 2014 – after his report of Sato's gift but a few
weeks before his daughter Chessy's assault at St. Paul's – Prout
contacted Vladeck, seeking representation in his dispute with
Invesco. Id. at ¶ 22. He told Vladeck that he was seeking advice
regarding separation options and communicated to her what had
transpired with Lo and Balachandria. Id. at ¶ 22. Vladeck and
the Vladeck Firm agreed to assist him and they entered into an
attorney-client relationship. Id. At that time, Vladeck
indicated to Prout that he had whistleblower retaliation claims
that could form the basis for a negotiated settlement. Id.

On July 2, 2014, Vladeck, on behalf of herself and the
Vladeck Firm, sent Prout an engagement letter outlining the
terms of Prout's agreement with the Vladeck Firm, including the
Vladeck Firm's agreement to "advise [Prout] regarding an exit
strategy" from his employer. Id. at ¶ 27. Defendant Vladeck
stated that she would be "primarily responsible for the work"
related to Prout's case. Id. Prout signed and returned the
letter, along with a $5,000 retainer, the following day. Id.

On July 21, 2014, Prout contacted Invesco's General
Counsel, Kevin Carome, stating that he worried that "certain
issues will expose the firm to potential liabilities and risk."

7

Id. at ¶ 28. Carome responded that "it actually would be better for each of us if you and I do not engage directly at this time." Id. at ¶ 29. Carome directed Prout to speak to Robert Rigsby, the Managing Director of Legal, and Washington Dender, the Global Head of Human Resources. Id.

Prout followed up, reiterating that he wanted to speak to Carome, and the two spoke on July 25. Id. at ¶ 30. Carome sought to characterize Prout's complaints as a "human resources" issue. He also suggested that Sato's gift had been investigated and resolved as "mere overspend." Id. Next, on July 29, Prout spoke with Dender, who characterized Lo's offensive comments as "mere personality conflict." Id. at ¶ 31. Dender further told Prout that he had two options: take a job with Invesco in the United States or leave the company. Id. However, Dender also suggested that there might not be any jobs available for Prout in the United States. Id.

On August 4, Vladeck wrote to Invesco stating that she and the Vladeck Firm represented Prout in "his claims of, inter alia, retaliation for raising concerns about potentially unlawful conduct; retaliation for taking family leave; and claims relating to the inappropriate conduct of his immediate supervisor." Id. at ¶ 33. That same day, Dender communicated to Prout that if he continued to call in sick, his absence would be

considered "job abandonment" and therefore grounds for termination. Id. at ¶ 34.

Vladeck spoke with Rigsby, who was handling the matter for Invesco, the next day. Id. at ¶¶ 34-35. According to Rigsby's notes on the conversation, Vladeck requested FMLA leave on behalf of Prout. Rigsby wrote that he would "relate the same to HR who will determine if such request will be with our [sic] without pay." Id. at ¶ 35. Dender then told Prout that he could commence family leave – and also that Prout would be fired if he did not take family leave. Id. at ¶ 36. If Prout were fired, he would be paid for four months of garden leave (approximately $145,000) and be given vesting of some stock (approximately $123,000) but would be required to repay approximately $748,000 in expenses. Prout wrote back that Invesco had "given [him] no choice" but to take leave without pay to care for his daughter. Id. at ¶ 36.

On August 8, Dender followed up to say that the expenses Prout would be required to repay would be only $383,922. Id. at ¶ 37. Dender also stated that Prout's last performance appraisal concluded that Prout "Needs Improvement" and that this rating would "have to weigh into any agreement." Id. Dender then encouraged that Prout take "Invesco leave," which was not job-protected, rather than FMLA leave because FMLA leave would require substantial paperwork. Id.

On August 10, 2014, Prout contacted Lesa Tucker, who worked in Invesco benefits, to ask some questions about leave policy options. Id. at ¶ 38. Prout learned from Tucker that he had been placed on "Personal leave." Id. Prout spoke with Tucker by phone on August 19, during which call Tucker explained the difference between FMLA leave and personal leave, "including . . . that personal leave would not guarantee Prout's job." Id.

On August 20, 2014, Prout applied for FMLA leave, attaching notes from his daughter's medical provider to his application. Id. at ¶ 39. Prout's application was approved on September 9, 2014. Id. at ¶ 40. Invesco granted Prout FMLA leave through October 31, 2014, anticipating that he would return to work on November 3, 2014. Id. at ¶ 41. However, during Prout's leave, Lo actively searched for someone to replace Prout and told Prout's colleagues that Prout would not be returning to work. Id. at ¶ 42. Sato told Prout's colleagues that he was not returning to work because of performance issues. Id.

In mid-October 2014, Dender told Prout that when he returned from leave, he should report to Invesco's Atlanta headquarters instead of his office in Hong Kong. Id. at ¶ 43. On November 3, 2014, when Prout arrived at Invesco's Atlanta headquarters, Dender presented Prout with two options: resign and receive $1,133,479 in compensation and stock vesting plus

dividends or be fired for cause and receive $71,271.80 in compensation. Id. at ¶ 44.

Prout asked what the cause for termination would be and Dender responded that it would be Prout's 2013 performance evaluation, in which Lo had stated that Prout's performance needed improvement. Id. Dender provided no explanation for why Invesco waited until after Prout's return from FMLA leave to terminate him for conduct that had allegedly taken place more than eleven months earlier and had been documented in a review delivered more than six months earlier. Id. at ¶ 45. Moreover, Prout believed that this 2013 review was "inaccurate." When Prout received it, he did not sign it and instead notified Invesco's Human Resources department in Hong Kong that the report was incorrect. Id.

Vladeck advised Prout to reject Invesco's settlement proposal. Id. at ¶ 50. She stated that Prout should not "settle for pennies on the dollar" and that he could get more if he filed a lawsuit. Vladeck told Prout that she believed she could get him a settlement equal to the value of his unvested stock in Invesco – roughly $3 million – in addition to payment of all of her attorney's fees. Id. at ¶ 51.

Relying on Vladeck's advice, Prout let the offer expire and he was terminated effective November 20, 2014. Id. at ¶ 52. He was paid through early December 2014. Id. at ¶ 76. In addition,

11

because Invesco deemed his termination a "voluntary resignation," it denied him vesting of 53,294 shares of Invesco stock. Id. at ¶ 77. On December 5, 2014, this stock was valued at $41.15 per share. Id. During the period between December 2014 and October 2017, Prout earned approximately $2 million from other employment. Id. at ¶ 78.

Vladeck and the Vladeck Firm did not thereafter prosecute Prout's claims. Id. at ¶ 79. Nor did they ever request that Invesco agree to a tolling agreement. Id. at ¶ 96. They did not advise Prout of the applicable statutes of limitations, including the 180-day deadline to file a charge with the Department of Labor in order to preserve a claim of whistleblower retaliation under the Sarbanes-Oxley Act. Id. at ¶ 80. As a result, Prout never filed a claim with the Department of Labor. Id. Prout was himself aware of the two-year statute of limitations that applied to his FMLA claims and so repeatedly attempted to contact Vladeck about the status of his case and to prepare to file a lawsuit within the two-year statute of limitations. Id. at ¶¶ 81, 83-92. For example, on September 27, 2016, Prout texted Vladeck that he "would like to fix plan for Invesco as SOL is approaching." Id. at ¶ 89. Defendants did not respond to these messages. Id. at ¶ 92. Defendants failed to take any action to preserve or otherwise prosecute Prout's claims. Id. at ¶ 82.

According to Prout, Vladeck did not even attempt to contact Invesco between late 2014, when Prout rejected Invesco's separation offer, and October 20, 2016, the eve of the expiration of the FMLA's two-year statute of limitations. Id. at ¶ 82. Nor did Vladeck produce a complaint for defendant to review. Id. On October 20, 2016, Vladeck spoke with Rigsby but did not reach a resolution. Id. at ¶ 93. Vladeck assured Prout that the three-year deadline for willful violations of the FMLA would apply to his case. Id. at ¶ 94.

Throughout defendants' three-year attorney client relationship with Prout, they never produced an invoice to inform Prout of hours worked. Id. at ¶ 98. However, defendants did "demand[]" that Prout pay them for the work allegedly done on his behalf. Id.

## III.  Prout's Retention of New Counsel

In June 2017, Prout contacted Sanford Heisler seeking new counsel in his claims against Invesco. Id. at ¶ 99. On June 27, 2017, Prout emailed Vladeck, asking her to send any files that she had regarding his case to Sanford Heisler. He reiterated his request on July 1, 2017. Defendants did not respond. Id. at ¶ 100.

On July 17, 2017, Sanford Heisler and defendants spoke by phone. Id. at ¶ 101. On this call, Sanford Heisler repeated Prout's request for his case files. Vladeck responded that Prout

13

should email her to confirm that she could speak with Sanford
Heisler. Prout accordingly emailed Vladeck so stating.
Defendants still did not produce Prout's case file. Id. at ¶
101.

On August 2, 2017, Vladeck emailed Sanford Heisler a
summary of defendants' representation of Prout. Id. at ¶ 102.
With respect to documents, Vladeck stated that "[Prout] also has
in his possession all of our correspondence and related
documents." Id. at ¶ 102. On October 31, 2017, Sanford Heisler
emailed Vladeck to confirm that she had no case file for Prout.
Id. at ¶ 103. On November 7, 2017, Vladeck emailed Sanford
Heisler and stated that she had previously provided defendants'
position regarding documents in her prior correspondence of
August 2. Id. at ¶ 104. Vladeck also asked whether Prout was
planning to pay defendants. Id.

Defendants have still not produced Prout's client file to
Prout or to Sanford Heisler. Nor have they produced any billing
invoices or any documents evidencing any billable work performed
on Prout's case. Id. at ¶ 107.

On July 3, 2017, Sanford Heisler sent Invesco a letter
informing the company of its representation and inviting
settlement negotiations. Id. at ¶ 109. On July 17, 2017, John
Cambria of Alston & Bird, LLP called Sanford Heisler Chairman
David Sanford to inform Sanford that he and his firm would be

14

representing Invesco in the dispute relating to Prout. Id. at ¶ 110. Cambria further stated that Invesco felt badly about how Prout and his family had been treated but that Invesco believed that "Prout had blown the statute of limitations on any claims that he might have had," such that the value of his claims for purposes of any settlement was substantially reduced. Id. Nonetheless, Cambria expressed that Invesco would likely agree to mediation with Prout. Id.

On August 11, 2017, Sanford Heisler sent Cambria a second letter detailing the factual and legal bases of Prout's claims. Id. at ¶ 111. The letter asserted claims for willful violations of the FMLA and violations of the anti-retaliation provisions of the Dodd-Frank Wall Street Reform Act ("Dodd-Frank"). Id. On August 25, 2017, Prout and Invesco agreed to a tolling agreement preserving all claims as they then existed. Id. at ¶ 112.

In a letter response dated September 7, 2017, Cambria acknowledged that Prout was asserting claims under Dodd-Frank and the FMLA. Cambria also noted that the two-year statute of limitations for any non-willful FMLA claim had passed, writing:

> [I]n November 2014, consistent with his request, Invesco presented Mr. Prout with a very generous severance package. However, other than repeated requests to extend his deadline for accepting it, Mr. Prout did not engage in discussions with Invesco about the substance of the package or make a counteroffer. It was only after Invesco's numerous attempts to obtain a response were

15

> ignored that Mr. Prout's employment with
> Invesco was terminated. Thus, far from
> engaging in "willful" misconduct, Invesco went
> above and beyond any legal obligations it owed
> to Mr. Prout.

Id. at ¶ 114. Invesco further expressed its view that Dodd-Frank
is inapplicable to Prout and that Prout had failed to file a
charge with the Department of Labor, as was necessary to exhaust
his claims under the anti-retaliation provision of the Sarbanes-
Oxley Act. Id. at ¶¶ 115-16.

In October 2017, Invesco and Prout agreed to mediate their
dispute. Id. at ¶ 118. Following mediation, on November 7, 2017,
Prout executed a legally binding Memorandum of Understanding
with Invesco. Id. at ¶ 119. Under the terms of the memorandum,
Invesco agreed to pay Prout and his attorneys $1.75 million
exchange for a general release of claims. On December 15, 2017,
Prout and Invesco executed a long-form settlement agreement on
December 15, 2017. Id.

## ANALYSIS

Defendants move to dismiss the Second Amended Complaint
under Federal Rule of Civil Procedure 12(b)(6) for failure to
state a claim.[1] Defendants also move to disqualify Sanford

---

[1] Defendants also move to dismiss for failure to join necessary
parties under Federal Rules of Civil Procedure 12(b)(7) and
19(a)(1). If a court determines that the particular party is
necessary, then it will order that party joined if it is

16

Heisler on the grounds that Sanford Heisler's representation of Prout would violate the New York Rules of Professional Conduct, which bar a lawyer from representing a client in a matter in which that lawyer is a necessary witness and also bar a lawyer from representing a client in a matter in which the lawyer and the client have a conflict of interest.

## I.  Motion to Dismiss

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Mere conclusory statements in a complaint and "formulaic recitation[s] of the elements of a cause of action" are not sufficient. Twombly, 550 U.S. at 555.

### A. Legal Malpractice

To properly plead an action against an attorney for legal malpractice under New York State law, in addition to privity between the parties, a plaintiff must allege facts that tend to

---

feasible. See ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., 102 F.3d 677, 682 (2d Cir. 1996). Only if the Court determines that a particular party is necessary and cannot be joined will the Court considers several factors to determine whether to dismiss the case. Id. at 681. Defendants do not contend that Sanford Heisler could not be joined. Therefore, even assuming arguendo that Sanford Heisler is a necessary party, dismissal is not warranted on this ground.

show: (1) that the attorney acted negligently; (2) that the attorney's negligence was the proximate cause of a loss sustained; and (3) actual and ascertainable damages. Baker v. Dorfman, 239 F.3d 415, 420 (2d Cir. 2000).

Prout's legal malpractice claim is premised on defendants' allowing the statutes of limitations to pass on claims under the Sarbanes-Oxley Act ("SOX") the Family and Medical Leave Act ("FMLA"). This failure allegedly forced Prout to settle his claims for less than he could otherwise have recovered (either through settlement or litigation).[2]

---

[2] Prout originally alleged that defendants were also negligent in letting the statute of limitations lapse on an otherwise-viable claim under Title VII. See Complaint at ¶ 49, ECF No. 1; First Amended Complaint at ¶ 50, ECF No. 21; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint ("Pl. Mem.") at 15-16, ECF No. 24. Prout is no longer pursuing that claim. Defendants ask the Court to dismiss the claim with prejudice. Under Federal Rule of Civil Procedure 41(b), "[i]f the plaintiff fails to prosecute . . ., a defendant may move to dismiss the action or claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision . . . operates as an adjudication on the merits." Fed. R. Civ. P. 41(b). "[D]ismissal for failure to prosecute is a harsh remedy to be utilized only in extreme situations." United States ex rel. Drake v. Norden Sys., Inc., 375 F.3d 248, 254 (2d Cir. 2004) (internal quotation omitted). The Second Circuit has directed that courts should consider the following factors in determining whether to dismiss a claim or action for failure to prosecute: "(1) the plaintiff's failure to prosecute caused a delay of significant duration; (2) plaintiff was given notice that further delay would result in dismissal; (3) defendant was likely to be prejudiced by further delay; (4) the need to alleviate court calendar congestion . . . [as] balanced against plaintiff's right to an opportunity for a day in court; and (5) . . . the efficacy of lesser sanctions." Id. Here, these factors weigh against dismissing the claim with prejudice for

### **1. Negligence**

"In order to establish negligence in a legal malpractice case, a plaintiff must allege that the attorney's conduct fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession." Kirk v. Heppt, 532 F. Supp. 2d 586, 592 (S.D.N.Y. 2008) (internal quotations omitted); see also Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006). "Generally, an attorney may only be held liable for 'ignorance of the rules of practice, failure to comply with conditions precedent to suit, or for his neglect to prosecute or defend an action.'" Achtman, 464 F.3d at 337 (quoting Bernstein v. Oppenheim & Co., 160 A.D.2d 428, 430 (N.Y. App. Div. 1990)). "[A] complaint that essentially alleges either an error in judgment or a selection of one among several reasonable courses of action fails to state a claim for malpractice." Kirk, 532 F. Supp. at 592 (internal quotations omitted); see also Achtman, 464 F.3d at 337 (an attorney's advice or "selection of one among several reasonable courses of action does not constitute malpractice").

---

failure to prosecute. However, the Court deems the claim dismissed without prejudice. Cf. Fed. R. Civ. P. 41(a)(1)(A)(i) ("[T]he plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment."); Fed. R. Civ. P. 41(a)(1)(B) ("Unless the notice or stipulation states otherwise, the dismissal is without prejudice.").

19

As noted, Prout alleges that defendants were negligent because they failed to prosecute his action and let lapse the statutes of limitations on Plaintiff's claims under SOX and the FMLA. In their response, defendants state that their decision not to file an action against Invesco was a reasonable strategic decision. In support of this defense, however, defendants cite sources outside the pleadings. Specifically, defendants point to evidence that they learned in October 2016, ten days before the non-willful FMLA claim statute of limitations was set to expire, that Prout (i) had taken proprietary information and documents from his employer upon the end of his employment; and (ii) had not been completely truthful with his subsequent employer during its investigation concerning his taking of the proprietary information and documents. See Memorandum of Law Submitted on Behalf of Defendants in Support of Their Motion To Dismiss Plaintiff's Complaint ("Def. Mem.") at 13-14, ECF No. 17; Declaration in Support of Defendants' Motion to Dismiss Plaintiff's Complaint ("Proscia Decl.") at Ex. D, ECF No. 16.

In assessing the motion to dismiss, the Court may not consider these materials. As defendants surely know, facts and allegations considered in the context of a motion to dismiss under Rule 12(b)(6) are limited to (1) the factual allegations set forth in the pleadings; (2) documents attached to the complaint as exhibits or incorporated by reference therein; (3)

matters of which judicial notice may be taken; and (4) documents upon which the complaint "relies heavily" and which are, thus, rendered "integral" to the Complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). The aforementioned documents and allegations relied upon by defendants do not fall within any of these categories.

Considering, then, only the facts pled in the complaint, these allegations, viewed in the light most favorable to plaintiff, adequately support the claim that defendants were negligent in their representation of Prout because they let the statutes of limitations pass on his claim for non-willful retaliation under the FMLA and for retaliation under SOX. An attorney's negligence in allowing a statute of limitations to run constitutes malpractice under New York law. See Argila v. Harley, 169 A.D.2d 683, 684 (N.Y. App. Div. 1991) (refusing to limit damages in "legal malpractice action alleg[ing] that defendants negligently allowed the statute of limitations to run.").

## 2. Proximate Causation

In general, to establish proximate, or "but for," causation in an action for attorney malpractice, a plaintiff must plausibly allege that, but for the malpractice, the plaintiff would have received a more advantageous result, would have prevailed in the underlying action, or would not have sustained

some actual and ascertainable damage. See Schwartz v. Olshan Grundman Frome & Rosenzweig, 302 A.D.2d 193, 198 (N.Y. App. Div. 2003). "The 'but for' prong requires the trier of fact in effect to decide a lawsuit within a lawsuit, because it demands a hypothetical re-examination of the events at issue absent the alleged malpractice." Even Street Prods., Ltd. v. Shkat Arrow Hafer & Weber, LLP, 643 F. Supp. 2d 317, 322 (S.D.N.Y. 2008) (internal quotation and alteration omitted); see also Rubens v. Mason, 527 F.3d 252, 255 (2d Cir. 2008) (citing Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc., 10 A.D.3d 267 (N.Y. App. Div. 2004)); Judd Burstein, P.C. v. Long, No. 15-cv-5295, 2017 WL 3535004, at *6 (S.D.N.Y. Aug. 16, 2017) ("A plaintiff must prove proximate cause through a 'case within a case' such that 'a reasonable fact-finder in the present case could conclude that a reasonable fact-finder in the underlying suit would have arrived at a different result but for the attorney's negligence.'" (quoting Riker v. Premier Capital, LLC, No. 15-cv-8293, 2016 WL 5334980, at *8 (S.D.N.Y. Sept. 22, 2016))).

Plaintiff bears a relatively difficult burden here since he settled, rather than testing his claims in court. "Where termination is by settlement rather than by a dismissal or adverse judgment, malpractice by the attorney is more difficult to prove." Titsworth v. Mondo, 407 N.Y.S.2d 793, 796 (Sup. Ct.

1978). However, there is "no automatic waiver of a plaintiff's right to sue for malpractice merely because plaintiff had voluntarily agreed to enter into a stipulation of settlement." Becker v. Julien, Blitz & Schlesinger, 406 N.Y.S.2d 412, 414 (N.Y. Sup. Ct. 1977), modified on other grounds, 66 A.D.2d 64 (N.Y. App. Div. 1978); see also Barry v. Liddle, O'Connor, Finkelstein & Robinson, 98 F.3d 36, 40 (2d Cir. 1996) (finding plaintiff's allegations and evidence that he could have obtained a higher settlement but for his attorney's negligence sufficient to survive summary judgment). "A settlement and release in an underlying action . . . do not preclude a subsequent action for legal malpractice where the settlement was compelled because of the mistakes of former counsel." Lattimore v. Bergman, 637 N.Y.S.2d 777, 777 (App. Div. 1996). That is, so long as the plaintiff can "demonstrate that if not for the alleged acts of malpractice, he would have been able to recover or proceed in a manner other than that which actually eventuated," he has stated a claim. Becker, 406 N.Y.S.2d at 414.[3]

---

[3] Bellinson Law, LLC v. Iannucci, 102 A.D.3d 563 (N.Y. App. Div. 2013), on which defendants rely, does not hold otherwise. In a two-paragraph opinion, that court found not only that the client had options other than settling the case, but also that the record failed to demonstrate either that the law firm was negligent or that the client had suffered any damages. Id. at 563.

23

Defendants argue that Prout would not have obtained a more favorable result but for their negligence because Prout did not have viable claims under the FMLA and SOX to begin with.[4] Alternatively, defendants argue that Prout would not have obtained a more favorable result but for their negligence even if he did have viable claims under the FMLA and SOX. Defendants assert that Prout could still have pursued (through his new counsel) equally viable claims against Invesco for a willful violation of the FMLA and for retaliation under the Dodd-Frank Act, the statutes of limitations on which had not passed by the time Sanford Heisler began representing him.

### a. **FMLA Claim**

"The FMLA provides generally that a covered employer is required to grant an eligible employee up to a total of 12 weeks leave during any 12-month period for personal or family needs indicated in the act." Coutard v. Municipal Credit Union, 848

---

[4] Defendants ask the Court to treat allegations in a complaint Prout filed against St. Paul's, in the district of New Hampshire, as judicial admissions. See Hausler v. JPMorgan Chase Bank, N.A., 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015). In that action, Prout asserted that he "had to leave his overseas job to support his family through the criminal trial, resulting in disastrous financial losses for the family." Proscia Decl. Ex. B at ¶ 132. Defendants argue that these allegations preclude Prout from now claiming that his employer terminated him for retaliatory reasons. Even assuming arguendo that these allegations are properly deemed judicial admissions, the Court agrees with Prout that this statement is consistent with Prout's claims here. Prout's pleading that he "had to leave his job" does not entail that Prout chose to leave his job.

F.3d 102, 108 (2d Cir. 2017) (citing 29 U.S.C. § 2612(a)).

"There are four principal facets to the scope of the Act: (1) the employers to which it applies, (2) the employees who are eligible for FMLA leave, (3) the personal or family relationship in question, and (4) the qualifying reasons for requested leave." Id.

To ensure the availability of its rights, the FMLA makes it illegal for employers to: (1) "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided under the FMLA; or (2) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a). "The FMLA 'creates a private right of action to seek both equitable relief and money damages against any employer . . . in any Federal or State court of competent jurisdiction' should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 174 (2d Cir. 2006) (quoting Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 724-25 (2003)). The Second Circuit has recognized two types of FMLA claims – "interference" claims and "retaliation" claims. Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). FMLA claims can be non-willful or willful. See Porter v. New York Univ. Sch. of Law, 392 F.3d 530, 531 (2d Cir. 2004).

Prout's FMLA claim was based on Invesco's terminating him
immediately following his return from FMLA leave.

**Whether Prout Had a Viable Non-Willful FMLA Claim**. Prout
has plausibly alleged that that he had a viable non-willful FMLA
claim for retaliation.[5] To state an FMLA retaliation claim, an
employee must show that "(1) he engaged in statutorily protected
activity, (2) he suffered an adverse employment decision, and
(3) the decision was causally related to the protected
activity." Martin v. Brevard Cty. Pub. Sch., 543 F.3d 1261, 1268
(11th Cir. 2008).[6]

First, with respect to whether Prout was entitled to FMLA
leave, such that he engaged in "statutorily protected activity,"
Prout has plausibly alleged that Invesco would have been

_____

[5] Prout argues that he also had an interference claim, but this
argument elides the distinction between an interference and a
retaliation claim. According to Prout, he had a valid claim for
interference because, upon his return from FMLA leave, he was
entitled to "'be restored by the employer to the position of
employment held by the employee when the leave commenced' or to
an equivalent position," id. (quoting 29 U.S.C. § 2614(a)(1),
and instead was fired. This is a retaliation claim, not an
interference claim. See Potenza v. City of New York, 365 F.3d
165, 168 (2d Cir. 2004) (observing that plaintiff's FMLA claim,
which alleged he had been terminated for taking FMLA leave,
"involve[d] retaliation rather than interference"); Di Giovanna
v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 203 (S.D.N.Y.
2003) (describing termination-based interference claim as
"really no more than an effort to dress [plaintiff]'s
retaliation claim in (barely) different clothing").

[6] Eleventh Circuit case law is relevant to Prout's legal
malpractice claims because Invesco is headquartered in Atlanta.

26

equitably estopped from denying Prout's entitlement. Where an
employer grants FMLA leave and the employee detrimentally relies
on that grant, the employer may not later assert that the
employee was not entitled to FMLA leave. See Kosakow v. New
Rochelle Radiology Assocs., P.C., 274 F.3d 706, 726 (2d Cir.
2001) ("[A]n employer who remains silent when its employee
announces that she plans to take medical leave is effectively
misleading that employee into believing that she is protected by
the FMLA."); see also Cooper v. New York State Nurses Ass'n, 847
F. Supp. 2d 437, 448 (E.D.N.Y. 2012) ("'[A]n employer who makes
an affirmative representation that an employee reasonably and
detrimentally believed was a grant of FMLA leave can be estopped
form later arguing that the employee was not in fact entitled to
that leave because she did not suffer a serious health
condition.'" (quoting Murphy v. FedEx Nat'l LTL, Inc., 618 F.3d
893, 899-900 (8th Cir. 2010)).[7]

Second, Prout has plausibly alleged that he was fired for
taking FMLA leave given the temporal proximity between his leave
and his termination. According to the Second Amended Complaint,
Invesco "fired [Prout] immediately when he returned to the
Company's Atlanta Headquarters, in November 2014." Second Am.

---

[7] The Court accordingly does not need to reach defendants'
argument that Prout was not in fact entitled to FMLA leave
because he worked abroad.

Compl. at ¶ 13. "The Second Circuit has made clear that '[p]roof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment.'" Cooper, 847 F. Supp. 2d at 448 (quoting DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)); see also Gordon v. Health & Hosps. Corp., No. 06-cv-1517, 2008 WL 924756, at *11 (E.D.N.Y. Mar. 31, 2008) ("[T]he temporal proximity of plaintiff's engagement in a protected activity . . . with defendants' decision to fire her can be sufficient in and of itself to establish a causal connection."); Martin, 543 F.3d at 1268 (finding that "close temporal proximity" is "more than sufficient to create a genuine issue of material fact of causal connection").

However, the inference of causation from timing can be undercut by "gradual adverse job actions [that] began well before the plaintiff had ever engaged in [the] protected activity." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001). Here, Invesco threatened to terminate Prout for job abandonment shortly before it approved his FMLA leave.[8] Although these allegations give rise to an inference that Invesco had other (even if potentially invalid) reasons for

---

[8] Prout does not allege that the time he took off prior to his FMLA leave is itself protected under the FMLA.

firing Prout, it is not the sort of "extensive period of progressive discipline" sufficient to undercut – as a matter of plausible pleading – the inference that Prout was fired for taking FMLA leave. Slattery, 248 F.3d at 95.[9] The Court accordingly finds that Prout has plausibly (though narrowly) alleged that he had a viable FMLA claim.

**Whether Prout Had a Similarly Viable Willful FMLA Claim**. Defendants argue that if Prout would have prevailed on a non-willful FMLA claim, then he also would have prevailed on a willful FMLA claim, which has a three year statute of limitations that had not yet run when Sanford Heisler began representing Prout. See 29 U.S.C. § 2617(c)(2).

Prout's counsel admitted that a willful FMLA claim "remained" at the time Sanford Heisler undertook Prout's representation. See ECF No. 34 at 24:23-25:11. However, Prout contends, it would have been difficult to prove. An employer's misconduct is willful only if the employer "knew or showed reckless disregard for the matter of whether its conduct was

---

[9] Defendants argue that Prout had already begun suffering adverse job actions before he went on approved FMLA leave, citing disputes that Prout himself raised with his attorney. See Supplemental Memorandum of Law in Support of Defendants' Motion to Dismiss ("Supp. Def. Mem.") at 2-3, ECF No. 23 (citing First Amended Complaint ¶¶ 13, 16, ECF No. 21). These do not suffice to establish an "extensive period of progressive discipline" sufficient to undercut the inference that Prout was fired for taking FMLA leave. Slattery, 248 F.3d at 95.

prohibited" by the FMLA. Porter, 392 F.3d at 531 (stating that the Second Circuit uses the Supreme Court's definition of "willful" as the term is used in the context of the Fair Labor Standards Act) (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1998)). "Neither an employer's 'good-faith but incorrect assumption' regarding its [statutory] obligations, nor an employer's lack of a reasonable basis for believing that it was complying with the [the statute], is by itself sufficient to demonstrate an employer's willfulness." Saunders v. City of New York, 594 F. Supp. 2d 346, 358 (S.D.N.Y. 2008) (articulating the FLSA standard); see also Trimmer v. Barnes & Noble, Inc., 31 F. Supp. 3d 618, 627 (S.D.N.Y. 2014) ("Reckless disregard . . . involves actual knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation." (internal quotation omitted)).

It is true that the Second Circuit has stated in an unpublished summary order that "retaliating against an employee for exercising FMLA rights is almost by definition a 'willful' violation." Offor v. Mercy Med. Ctr., 676 Fed. App'x 51, 54 n.2 (2d Cir. 2017). But aside from the fact that the summary order in Offor expressly recites that it is non-precedential, the brief discussion in Offor involved a very different factual context than is presented in the instant motion.

The issue here is whether Prout's legal position, and therefore his bargaining power at settlement, would plausibly have been made materially stronger if defendants had not allowed his non-willful FMLA claim to lapse. The very fact that the standard for willfulness is a high one, and that it involves inquiries into subjective states of mind that are inherently more difficult to prove than the objective facts that establish negligence, illustrates that, as a practical matter, preservation of a claim of a negligent violation of the FMLA is plausibly a material "bargaining chip" that Prout here lost by defendants' allowing the relevant statute of limitations to expire. Although it might be unusual for the kind of violation of the FMLA here alleged not to be willful (though Congress clearly contemplated that the two could be different and hence provided different statutes of limitations), it ignores the realities of hard bargaining for defendants to assert that Prout would not have been in a materially better bargaining position as to his settlement negotiations if he had still been able to argue that he was not required to prove a willful violation of the FMLA because he had preserved the non-willful claim.

Nor is this point a matter of speculation. On the contrary, as alleged in the Second Amended Complaint, Invesco, in correspondence concerning the parties' dispute, expressly argued

that it had not engaged in any "willful" conduct. Second Am.
Compl. ¶ 114.

Accordingly, Prout has plausibly alleged that defendants'
failure to preserve his non-willful FMLA claim was materially
detrimental to his bargaining power. Nor can this be viewed in
isolation of his SOX claim. The combination of bargaining
detriments he suffered from the loss of his non-willful FMLA
claim and the loss of his SOX claim, discussed below,
effectively compelled him to settle his claims, and to settle
for less than he would have settled but for defendants'
malpractice.

### b. Sarbanes-Oxley Claim

**Whether Prout Had a Viable SOX Claim.** Section 806 of SOX
provides whistleblower protection for employees of publicly
traded information. To succeed in making a prima facie case
under this provision, "'an employee must prove by a
preponderance of the evidence that (1) she engaged in protected
activity; (2) the employer knew that she engaged in the .
protected activity; (3) she suffered an unfavorable personnel
action; and (4) the protected activity was a contributing factor
in the unfavorable action.'" Bechtel v. Admin. Review Bd.,
United States Dep't of Labor, 710 F.3d 443, 447 (2d Cir. 2013)
(quoting Harp v. Charter Commcn's, Inc., 558 F.3d 722, 723 (7th
Cir. 2009)); see also Nielsen v. AECOM Tech. Corp., 762 F.3d

214, 219 (2d Cir. 2014). Here, Prout alleges that his report of
a potential FCPA violation contributed to his termination.
Defendants argue that Prout has failed to allege that he ever
had a viable SOX claim against Invesco for several reasons.

First, defendants argue that the reporting of putative FCPA
violations does not constitute "protected activity" under SOX,
especially where there is no allegation that the violator
intended to defraud the shareholders of a publicly traded
company. This appears to be an open question. SOX makes it
unlawful for a publicly traded company to "discharge, demote,
suspend, . . . or in any other manner discriminate against an
employee . . . because of any lawful act done by the employee to
provide information, cause information to be provided, or
otherwise assist in an investigation regarding any conduct which
the employee reasonably believes constitutes a violation of 1)
section 1341, 1343, 1344, or 1348, 2) any rule or regulation of
the Securities and Exchange Commission, or 3) any provision of
Federal law relating to fraud against shareholders." 18 U.S.C. §
1514A(a)(1).

The parties have identified one case holding that reporting
an FCPA violation is never protected under SOX, one holding that
it sometimes is protected, and a third holding that it is always

33

protected.[10] In Asadi v. G.E. Energy (USA), LLC, the court found
that SOX does not protect reporting FCPA violations because the
FCPA does not "protect" or "require" internal reporting of
alleged bribery. No. 4:12-345, 2012 WL 2522599, at *6 (S.D. Tex.
June 28, 2012). In Meng-Lin Liu v. Siemens A.G., a court in this
District suggested that reporting FCPA violations "could only
conceivably fall within 'fraud against shareholders,'" and,
further, that such reporting could fall within that category
only if the whistleblower alleged an "intent to defraud
shareholders." 978 F. Supp. 2d 325, 330 (S.D.N.Y. 2013).
Finally, in Wadler v. Bio-Rad Labs., Inc., the court held
broadly that "disclosure of alleged FCPA violations (both its
anti-bribery provisions and its books-and-records requirements)
is . . . protected activity under the Sarbanes-Oxley Act." No.
15-cv-2356, 2017 WL 1910057, at *5 (N.D. Cal. May 10, 2017),
appeal docketed, No. 17-16193 (9th Cir. June 8, 2017). There,
defendants had conceded that "there is a rule or regulation of
the SEC regarding the books and records provisions of the FCPA,
and so reporting a books and records violation could support a
Sarbanes-Oxley claim." Id. The court also noted that the FCPA is
an amendment to the Securities and Exchange Act of 1934 and is
codified within it. Id.

---

[10] The Court itself did not identify any additional cases
directly addressing the question.

Based on this survey of case law, the Court concludes that Prout has plausibly alleged that his report of Sato's potential FCPA violation was protected under SOX. This is especially true because Prout alleges that Sato sought to skirt SOX reporting requirements, and thereby defraud shareholders, by paying "for the wine from his personal account - seemingly to throw off any internal investigation." Second Am. Compl. ¶ 18.

Second, defendants assert that applying SOX to Prout's claim would be an improper extraterritorial application of the statute. See Ulrich v. Moody's Corp., No. 13-cv-00008, 2014 WL 4977562, at *7 (S.D.N.Y. Mar. 31, 2014), aff'd No. 17-1060-cv, 2018 WL 357539 (2d Cir. Jan. 11, 2018) (finding that the anti-retaliation provision of SOX does not apply extraterritorially); cf. Liu Meng-Lin v. Siemens AG, 763 F.3d 175, 183 (2d Cir. 2014) (Dodd-Frank's whistleblower protection does not apply extraterritorially). "[I]t is a rare case . . . that lacks all contact with the territory of the United States [and] the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 266 (2010). Prout's claim has the following domestic features: the conduct that he reported took place in the United States, Prout worked for the foreign subsidiary of an American company at the time he

reported the conduct, Prout is a United States citizen, and Prout was fired in the United States.

The Court finds that these domestic features – and in particular the fact that the conduct reported took place in the United States – are sufficient to render the application domestic. Cf. Ulrich, 2014 WL 4977562 at *8 (finding that plaintiff's claims originated outside the United States where the alleged wrongdoing, the protected activity, and the retaliation plaintiff allegedly experienced all occurred in Hong Kong).

Defendants lastly argue that Prout has failed to adequately plead that he ever had a viable SOX claim because the allegations in the Second Amended Complaint do not establish a causal connection between the protected activity and any adverse employment action. In the context of a retaliation claim, a plaintiff can plead a causal connection "directly, by alleging facts of retaliatory animus against him, or indirectly, either by showing a temporal relationship in which the protected activity was followed closely in time by discriminatory treatment, or by other circumstantial evidence." Wang v. Palsimano, 157 F. Supp. 3d 306, 327 (S.D.N.Y. 2016) (internal quotation omitted).

Prout has plausibly alleged that he suffered "retaliatory animus."[11] In the Title VII context, "[n]egative reactions by an employer to a plaintiff's complaints of discrimination have been deemed indicative of retaliatory animus." White v. Dep't of Correctional Servs., 814 F. Supp. 2d 374, 390 (S.D.N.Y. 2011). Here, Prout alleges that when he reported the FCPA violation to the Head of Legal for Invesco Asia Pacific, she told him that if he reported it to Andrew Lo he would "shit on [his] head." Second Am. Compl. ¶¶ 19-20. When Prout persisted and reported the violation to Lo, Lo's response was "effectively, 'So What?'" Prout alleges that Lo "became increasingly hostile towards [him] almost immediately after he" reported the bottle of wine. Id. at ¶ 73. In addition, in June 2014, Lo "became irate" that a report Prout prepared "had minor formatting issues." Id. ¶ 25. These allegations of Invesco's negative reaction to Prout's reporting of the FCPA violation give rise to a plausible inference that Prout was retaliated against for the report. This conclusion is

---

[11] The Court therefore need not reach whether Prout has sufficiently alleged a temporal relationship in which the protected activity was closely followed by discriminatory treatment. In order for temporal proximity to establish causality, the intervening period between the protected activity and the adverse employment action must be "very close." Dawson v. City of New York, 2013 U.S. Dist. LEXIS 117744, at *47-48 (S.D.N.Y. Aug. 19, 2013). Here, there was almost a seven-month gap between Prout's original report to Lo in April 2014 and his termination on November 3, 2014.

bolstered by the fact that Vladeck told Prout that he had "had whistleblower retaliation claims that could form the basis for a negotiated settlement." Second Am. Compl. at ¶ 22.

Accordingly, the Court finds that Prout has plausibly alleged that he would have had a viable retaliation claim under SOX if not for defendants' negligence.

**Whether Prout Had a Similarly Viable Dodd-Frank Claim.**
Defendants argue that even if Prout did have a viable SOX claim but for the lapsed statute of limitations, defendants' alleged negligence was not a "but for" cause of any harm because Prout recovered for the same alleged injury by settling a claim for retaliation under Dodd-Frank. Dodd-Frank, like SOX, "shield[s] whistleblowers from retaliation." Digital Realty Trust, Inc. v. Somers, 138 S. Ct. 767, 772 (2018). Prout concedes that he did, in fact, settle his Dodd-Frank claim with Invesco. However, he has plausibly alleged that he was effectively left with no other recourse but to settle this remaining claim.

Prout's Dodd-Frank claim rested on shaky grounds. As noted by Invesco during settlement negotiations, courts in the Eleventh Circuit, where Invesco is headquartered, had held that an individual must report misconduct to the Securities and Exchange Commission ("SEC") in order to qualify as a whistleblower and bring a claim under Dodd-Frank's anti-retaliation provisions. Second Am. Compl. at ¶ 115. And Invesco

knew during settlement negotiations that the Supreme Court might soon invalidate Prout's Dodd-Frank claim by agreeing with those courts and holding that to qualify as a whistleblower under Dodd-Frank, an employee must have reported the alleged misconduct to the SEC and devalued that claim accordingly. See id. The Supreme Court ultimately did so hold, on February 21, 2018. See Digital Realty Trust, Inc., 138 S. Ct. 767.

Defendants contend that, even taking into account Invesco's "substantial leverage" during settlement negotiations with respect to Prout's Dodd-Frank claim, Prout still has not plausibly alleged that he suffered any damages since Dodd-Frank entitles a plaintiff to recover greater damages than in a SOX claim, including double backpay. SOX, by contrast, limits recovery to actual backpay with interest. See Digital Realty Trust, Inc., 138 S. Ct. at 774-75.[12] But which statute would have ultimately afforded Prout greater relief is unclear. Unlike Dodd-Frank, SOX "explicitly entitles a prevailing employee to 'all relief necessary to make the employee whole,' including 'compensation for any special damages sustained as a result of

---

[12] Both SOX and Dodd-Frank authorize reinstatement and compensation for litigation costs, expert witness fees, and reasonable attorneys' fees. Digital Realty Trust, Inc., 138 S. Ct. at 775.

the discrimination.'" Id. at 775 n.4 (quoting 18 U.S.C. §
1514A(c)(1), (2)(C).

Given all this, Prout has plausibly alleged that
defendants' negligence in letting the statute of limitations
lapse on his SOX claim left him with little choice but to settle
and reduced his potential recovery from Invesco.[13]

### 3. Damages

Lastly, defendants argue that Prout has failed to plead any
actual and ascertainable damages because the settlement that
Prout ultimately entered into with Invesco was for a greater
amount than the settlement Invesco initially offered and that
defendants advised him to reject. See Second Am. Compl. ¶¶ 44,
119 (Invesco initially offered $1,133,479,00 "in compensation
and stock vesting plus dividends" and ultimately settled with
Prout for $1.75 million). Thus, defendants reason, "the absence
of an actual pecuniary injury defeats any conceivable cause of

---

[13] Defendants' argument that their alleged negligence cannot have
proximately caused any injury because Sanford Heisler had
sufficient time and opportunity to adequately protect Prout's
rights is without merit. Where a plaintiff, on his own or
through subsequent counsel, has "sufficient time and
opportunity" to adequately protect his rights, any alleged
negligence by the former counsel cannot proximately cause that
plaintiff's injury. See Hufstader v. Friedman & Molinsek, P.C.,
150 A.D.3d 1489, 1490 (N.Y. App. Div. 2017); Maksimiak v.
Schwartzapfel Novick Truhowsky Marcus, P.C., 82 A.D.3d 652, 652
(N.Y. App. Div. 2011). Here, there is no indication that Sanford
Heisler failed to adequately protect Prout's remaining rights.
There is nothing Sanford Heisler could have done to revive
Prout's SOX and non-willful FMLA claims.

action for malpractice." Second Supplemental Memorandum of Law in Support of Defendants' Motion to Dismiss at 3-4, ECF No. 37; see Fusco v. Fauci, 299 A.D.2d 263 (N.Y. App. Div. 2002) (affirming dismissal of malpractice claim based on erroneous settlement advice where 'the amount of the settlement . . . exceed[ed] the [amount] plaintiff previously stipulated to accept in full satisfaction of [his] underlying claims, plus interest").

However, Prout's allegations that defendants told him his claims were worth at least $3 million and that Invesco told him the value of his claims was substantially reduced by the lapsed statutes of limitations, Second Am. Compl. ¶¶ 51, 110, give rise to a plausible inference that defendants' negligence resulted in damages.[14] It is a question of fact, inappropriate for resolution at the motion to dismiss stage, whether the amount of Prout's settlement was within the range of what the jury's verdict or settlement would have been. Titsworth v. Mondo, 407 N.Y.S.2d 793, 799 (Sup. Ct. 1978).[15]

---

[14] Unlike in Fusco v. Fauci, where plaintiff's lawyer was allegedly negligent in failing to settle plaintiff's case for $700,000 as directed and plaintiff later settled for $1,250,000, Prout rejected Invesco's initial $1 million settlement offer. 749 N.Y.S.2d 715, 715 (App. Div. 2002); No. 109704/98, 2001 WL 36119232 (N.Y. Sup. Ct. June 15, 2001).

[15] Defendants also argue that Prout is precluded from pursuing recovery in this action because he has already recovered for his alleged lost wages and opportunity in the action he brought

41

In sum, the Court finds that Prout has plausibly alleged a legal malpractice claim based on defendants' letting the statute of limitations lapse on his SOX claim but not based on defendants' letting the statute of limitations lapse on his FMLA claim.

## B. Breach of Fiduciary Duty

Prout alleges that defendants breached their fiduciary duty by (i) withholding the $5,000 retainer fee he paid them; and (ii) failing to turn over any of the files relating to his case to Sanford Heisler. Defendants move to dismiss Prout's breach of fiduciary duty claims as duplicative of his legal malpractice claim and for failure to state claim.

### 1. Whether the Breach of Fiduciary Duty Claims Are Duplicative

"Under New York law, where a claim for breach of fiduciary duty is 'premised on the same facts and seeking the identical relief' as a claim for legal malpractice, the claim for fiduciary duty 'is redundant and should be dismissed.'" Nordwind

---

against St. Paul's in New Hampshire. See Def. Mem. at 20. In support of this argument, defendants state that Prout claimed job-related damages in the New Hampshire case that exceeded $3 million, and that that case has now has settled. See id. (citing Proscia Decl. Exs. K, L). Defendants then assert, without citation, that "[p]laintiff's settlement within the New Hampshire Action constitutes an implied waiver to any claim for job-related damages he did not recover therein." Id. The Court finds that it cannot resolve at the motion to dismiss stage what effect, if any, Prout's settlement of the New Hampshire action has on his right to recover in the instant action.

42

v. Rowland, 584 F.3d 420, 433-34 (2d Cir. 2009) (quoting Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc., 10 A.D.3d 267 (N.Y. App. Div. 2004)).

Prout's claim for breach of fiduciary duty is not duplicative. "The fiduciary duty of an attorney . . . 'extends both to current clients and former clients and thus is broader in scope than a cause of action for legal malpractice.'" Neuman v. Frank, 82 A.D.3d 1642, 1643 (N.Y. App. Div. 2011) (quoting TVGA Eng'g, Surveying, P.C. v. Gallick, 45 A.D.3d 1252, 1256 (N.Y. App. Div. 2007)). "Thus, a cause of action for legal malpractice based upon alleged misconduct occurring during the attorney's representation of the plaintiff is not duplicative of a cause of action for breach of fiduciary duty based upon alleged misconduct occurring after the termination of the representation." Id. Here, Prout's fiduciary duty claim is not duplicative of his legal malpractice claim because it depends not on defendants' letting the statute of limitations lapse during the defendants' representation of him but rather on defendants' failing to turn over their files relating to Prout's case to his new counsel and failing to return his retainer fee after the termination of the representation.

### 2. Whether Prout Has Failed To State a Breach of Fiduciary Duty Claim

The elements of a breach of fiduciary duty claim are: "(1) negligence by the attorney; (2) that the negligence was the proximate cause of the loss sustained; and (3) proof of actual damages." Stevens & Lee, P.C. v. Levine, 2011 N.Y. Misc. LEXIS 5044, at *2 (N.Y. App. Div. 2011).

First, with respect to the retainer fee, defendants contend that Prout still owes defendants for their legal services such that defendants have properly asserted a lien on Prout's retainer fee. "[A] lawyer breaches his fiduciary duty to his client when the lawyer fails to return the unearned advance payment retainer when the engagement ends." In re Dewey & Leboeuf LLP, 493 B.R. 421, 433 (Bankr. S.D.N.Y. 2013) (emphasis added) (citing Ruberto v. DeFilippo, 913 N.Y.S.2d 889, 889 (N.Y. Civ. Ct. 2010)). The allegations in the complaint do not give rise to a plausible inference that the $5,000 retainer fee has not been earned. Even if defendants have "not produced any billing invoices or otherwise provided documents evidencing any billable work performed on Prout's case," Second Am. Compl. ¶ 107, they clearly have done at least $5,000 of work, see id. at ¶ 33 (describing letter Vladeck sent to defendants), ¶ 35 (describing conversation between Vladeck and Invesco official regarding Prout's requested FMLA leave). Therefore, Prout has failed to state a claim for legal malpractice based on defendants' failure to turn over his retainer fee.

Second, defendants argue that they also are under no obligation to turn over Prout's files in light of Prout's failure to compensate them for their services. A "common law 'retaining lien' . . . allows withdrawing counsel to retain pleadings and other documents in counsel's possession until counsel is paid for his or her work." Star Funding, Inc. v. Vault Minerals, LLC, No. 15-cv-3026, 2017 WL 7790610, at *2 (S.D.N.Y. Aug. 31, 2017).[16] "[W]here a client requests that papers in the possession of his former attorney be returned to him, and the attorney asserts a claim for compensation for services rendered, the attorney is entitled to a determination fixing the value of his services, and the amount so fixed must be paid or otherwise secured to the attorney before any such turnover may be enforced." Rosen v. Rosen, 97 A.D.2d 837, 837 (N.Y. App. Div. 1983). However, this lien is available only "where an attorney's representation terminates and there has been no misconduct, no discharge for just cause and no unjustified abandonment by the attorney." Klein v. Eubank, 663

---

[16] Defendants also assert that they are entitled a statutory charging lien, which is authorized by "New York Judiciary Law § 475, which allows for liens 'upon his client's cause of action, claim or counterclaim which attaches to a . . . judgment in his or her client's favor, and the proceeds thereof . . . .'" Star Funding, 2017 WL 7790610, at *2. Defendants fail to explain how a charging lien is relevant to the issue of whether they properly withheld Prout's files. The Court therefore only addresses whether defendants are entitled to a common law lien.

N.E.2d 599, 601 (N.Y. Ct. App. 1996). Given that, as discussed above, Prout has plausibly alleged that defendants committed legal malpractice, defendants are not entitled to a common law lien.

However, defendants further argue that even if they were obligated to return Prout's files, Prout still would have failed to state a claim because he has not alleged that defendants' withholding of the files proximately caused any actual damages. Prout argues that he suffered damages as a result of defendants' failure to turn over his case file because "[h]e was forced to resolve his case for considerably less money than he would otherwise have received, including less than the $3 million plus attorney fees that Defendant Vladeck told Plaintiff his case was worth." Plaintiff's Memorandum of law in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint at 17-18, ECF No. 24. Prout does not actually explain how defendants' failure to turn over the case files contributed to his resolving his case for considerably less money than he would otherwise have received. Since defendants' production of his case file, to the extent one exists, see Second Am. Compl. ¶¶ 102-104, could not un-do the lapse of Prout's statutes of limitations, the only possible damage Prout could have suffered is having to pay Sanford Heisler to do work already conducted by defendants. But Prout does not allege that he suffered such damages. Therefore,

Prout has not plausibly alleged that he suffered any damages as a result of defendants' alleged refusal to turn over his file and the Court dismisses Prout's claim for breach of fiduciary duty.

## II.   Motion to Disqualify

Finally, defendants seek to disqualify Sanford Heisler. "The power to disqualify an attorney is drawn from a court's 'inherent power to preserve the integrity of the adversary process.'" Acker v. Wilger, No. 12-cv-3620, 2013 WL 1285435, at *1 (S.D.N.Y. Mar. 29, 2013) (quoting Hempstead Video, Inc. v. Inc. Vill. Of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005)). A motion to disqualify an attorney is committed to the discretion of the Court. See Purgess v. Sharrock, 33 F.3d 134, 144 (2d Cir. 1994). "[N]ot every violation of a disciplinary rule will necessarily lead to disqualification." Hempstead Video, 409 F.3d at 132. In particular, "[d]isqualification is only warranted in the rare circumstance where an attorney's conduct 'poses a significant risk of trial taint.'" Decker v. Nagel Rice, LLC, 716 F. Supp. 2d 228, 231 (S.D.N.Y. 2010) (quoting Glueck v. Jonathan Logan, INc., 653 F.2d 746, 748 (2d Cir. 1981)).

Rule 3.7 of the New York Rules of Professional Conduct provides, with certain exceptions, that "[a] lawyer shall not act as an advocate before a tribunal in a matter in which the

lawyer is likely to be a witness on a significant issue of
fact." N.Y. R. Prof'l Conduct 3.7(a). Accordingly, an attorney
may be disqualified from representing a client in an action when
such attorney is a necessary witness who has "knowledge of the
facts and [has] participate[d] in some of the events giving rise
to [the lawsuit]" and who, if allowed to participate as both an
advocate and a witness, "would jeopardize [the court's] interest
in ensuring that the trial is conduct fairly and in conformity
with prevailing ethical rules." United States v. Napoli, No. 10-
CR-150, 2010 WL 1687669, at *4 (E.D.N.Y. 2010). In order to
disqualify an attorney based on the advocate-witness rule, "a
party must demonstrate that the testimony is both necessary and
substantially likely to be prejudicial." Decker, 716 F. Supp. 2d
at 232 (internal quotation omitted).

"Rule 3.7 lends itself to opportunistic abuse. 'Because
courts must guard against the tactical use of motions to
disqualify counsel, they are subject to strict scrutiny,
particularly motions' under the witness advocate rule." Murray
v. Metropolitan Life Ins. Co., 583 F.3d 173, 178 (2d Cir. 2009)
(quoting Lamborn v. Dittmer, 873 F.2d 522, 531 (2d Cir. 1989)).
"The movant, therefore, 'bears the burden of demonstrating
specifically how and as to what issues in the case the prejudice
may occur and that the likelihood of prejudice occurring [to the
witness-advocate's client] is substantial." Id. (quoting

Lamborn, 873 F.2d at 531). However, "any doubts are to be resolved in favor of disqualification." Decker, 716 F. Supp. 2d at 232. "'A finding of necessity takes into account such factors as the significance of the matters, the weight of the testimony, and the availability of other evidence.'" Soberman v. Groff Studios Corp., No. 99-CV-1005, 1999 WL 349989, at *7 (S.D.N.Y. June 1, 1999) (quoting Stratavest Ltd. v. Rogers, 903 F. Supp. 663, 667 (S.D.N.Y. 1995)). The "availability of other witnesses is essentially fatal to the 'necessity' prong of the disqualification inquiry." John Wiley & Sons, Inc. v. Book Dog Books, LLC, 126 F. Supp. 3d 413, 423 (S.D.N.Y. 2015) (collecting cases); see also Acker v. Wilger, No. 12-cv-3620, 2013 WL 1285435, at *3 (S.D.N.Y. Mar. 29, 2013).

In addition to arguing that its testimony would not be necessary, Sanford Heisler argues that the motion for disqualification is premature. The Court agrees. The "witness-advocate rule is concerned with preventing potential taint at trial." Ross v. Blister, No. 09-cv-8666, 2009 WL 4907062, at *3 (S.D.N.Y. Dec. 21, 2009) (emphasis in original). Thus, "where there has been only limited discovery and it is not yet clear the extent to which an attorney's testimony might be necessary or prejudicial, numerous courts have found that motions to disqualify counsel are premature." Id. (collecting cases); see also Gormin v. Hubregsen, No. 08-cv-7674, 2009 WL 508269, at *3

49

(S.D.N.Y. Feb. 27, 2009) (prior to discovery, "it is impossible
to determine how significant [counsel] might be as a witness or
whether he is likely even to be called as a witness; whether his
testimony would likely hurt or help his client; or whether his
testimony would or would not be cumulative of other witnesses.
Based on such a record, courts in this District commonly deny
disqualification motions."). Here, where there is no record on
which to base a disqualification motion, the Court cannot
determine with sufficient certainty that defendants have borne
their "high burden" to show that Sanford Heisler's testimony
will be necessary at trial or that the content of that testimony
is likely to be prejudicial to Prout. See Ross, 2009 WL 4907062,
at *4.

Defendants also move to disqualify Sanford Heisler on the
ground that the firm has a conflict of interest resulting from
defendants' "intention" to implead it. Rule 1.7(a) of the New
York Rules of Professional Conduct provides, in pertinent part:

> [A] lawyer shall not represent a client if a
> reasonable lawyer would conclude that either:
> (1) the representation will involve the lawyer
> in representing differing interests; or (2)
> there is a significant risk that the lawyer's
> professional judgment on behalf of a client
> will be adversely affected by the lawyer's own
> financial, business, property or other
> personal interests.

N.Y. R. of Prof'l Conduct 1.7(a). Plaintiff argues that because
defendants' threatened impleader action has no basis in law or

fact, defendants have failed to meet their burden to show "a significant risk that the conflict will affect the attorney's ability to represent his or her client with vigor." Commercial Union Ins. Co. v. Marco Int'l Corp., 75 F. Supp. 2d 108, 110 (S.D.N.Y. 1999). Specifically, "Sanford Heisler asserted all of Plaintiff's viable claims that remained at the time Sanford Heisler assumed representation; Sanford Heisler had no opportunity to cure the lapsed statutes [of] limitations caused by Defendants' conduct." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Disqualify Sanford Heisler Sharp, LLP as Plaintiff's Counsel Herein at 15-16, ECF No. 26.

Defendants' motion to disqualify on the basis of Sanford Heisler's anticipated conflict of interest therefore turns on whether or not defendants will ultimately file and prevail on their impleader action. The Court declines to evaluate the viability of defendants' impleader action before it has been filed.

Accordingly, the Court denies defendants' motion to disqualify Sanford Heisler without prejudice to renewing the motion following either the close of discovery or a successful impleader action by defendants.

## CONCLUSION

51

In sum, the Court denies defendants' motion to dismiss with respect to Prout's FMLA-based and SOX-based legal malpractice claims, but grants the motion with respect to Prout's breach of fiduciary duty claim. The Court also dismisses Prout's Title-VII based legal malpractice claim without prejudice. Finally, the Court denies defendants' motion to disqualify Sanford Heisler without prejudice to the possibility of its being re-raised at later stages of this litigation.

The parties are directed to jointly call chambers by no later than Tuesday, June 12 to discuss the setting of deadlines in the case management plan.

SO ORDERED.

Dated:    New York, NY

      June /d, 2018

                                        JED S. RAKOFF, U.S.D.J.