UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
ALEXANDER PROUT,                      :
                                      :
                                      :
        Plaintiff,                    :
                                      :
        -v-                           :
                                      :
ANNE C. VLADECK and VLADECK,          :
RASKIN & CLARK, P.C.,                 :
                                      :
                                      :
        Defendants.                   :
------------------------------------- x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/15/19
```

18 Civ. 260 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.

Before the Court is the motion of defendant's Anne C.

Vladeck and Vladeck, Raskin & Clark, P.C. ("VRC") for summary

judgment on the legal malpractice claim of plaintiff Alexander

Prout. ECF No. 118. After receiving full briefing from each

side, the Court held oral argument on March 19, 2019. In a

"bottom-line" Order issued on March 26, 2019, ECF No. 140, the

Court denied defendants' motion in its entirety. This Opinion

sets forth the reasons for the Court's ruling.

## Factual Background

Except where otherwise noted, the following facts, either

undisputed or, where disputed, taken most favorably to the non-

movant plaintiff, are taken from the parties' Rule 56.1

Statements and Counterstatements:

From 2003 to 2012, plaintiff Alexander Prout served as CEO of Invesco Japan. Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material and Undisputed Facts ¶ 2 ("Prout 56.1 Counterstatement"), ECF No. 130. In September 2012, Prout was succeeded by Alexander Sato, and from September 2012 to August 2013, Prout served as Chairman of Invesco Japan. Id. ¶¶ 3, 6. Thereafter, Prout served as Managing Director and Regional Head of Business for Invesco Asia-Pacific. Id. ¶ 9.

During his time at Invesco, Prout reported to Andrew Lo, Invesco's Senior Managing Director of Asia Pacific. Id. ¶ 11. Lo had a reputation for creating a hostile work environment, and Prout testified that Lo once yelled at him on a telephone call prior to the events described below. Id. ¶¶ 13-15. Lo also conducted Prout's annual performance review, and in 2013, Lo gave Prout a performance rating of "Needs Improvement / Developing" in the "Overall Performance Category," as well as in several other categories. See ECF No. 119, Ex. K, at 3-6, 8-10. Lo also made positive comments, however, including that Prout "has strong competencies," "is a senior executive with substantial regional & global experience," and "is a strong business driver." Id. at 9.

In April 2014, Prout heard a rumor that Sato had purchased a $4,000 bottle of wine for a senior executive at a Japanese

2

Bank. Prout 56.1 Counterstatement ¶ 28. Concerned that Sato's conduct may have violated various laws and internal rules, Prout reported the rumor to Asha Balachandra, Head of Legal for Invesco Asia Pacific. Id. ¶¶ 29-31. Balachandra advised Prout to report the rumor through Invesco's anonymous whistleblower hotline because otherwise "Lo would s[---] on [Prout's] head." Prout Dep. 43:22-25, ECF No. 119, Ex. C. Prout did not use the hotline but instead told Lo and warned Lo about the consequences of Sato's gift. Prout 56.1 Counterstatement ¶¶ 35-40. Prout testified that Lo's response was, in substance, "so what." Prout Dep. 46:11-13. On May 2, 2014, Balachandra followed up with Prout, and Invesco initiated an internal investigation into Sato. Prout 56.1 Counterstatement ¶¶ 42, 45-46.

Soon after, on May 13, 2014, Prout introduced himself via email to defendant Anne Vladeck. ECF No. 119, Ex. P, at 3. Prout informed Vladeck that he was "currently considering career options" and "would like to discuss my current circumstances / situation and understand my options." Id. Vladeck responded on May 15 that she "would be happy to talk to" Prout. Id. at 2. Prout replied on May 26 that he was "in active consideration of leaving Invesco" and had "had an ethical disagreement with my boss and no longer feel comfortable working at the firm." Id. Prout also said he was "in discussions with another firm." Id.

Toward the end of May 2014, Prout's daughter Chessy was sexually assaulted at the St. Paul's School in New Hampshire. Prout 56.1 Counterstatement ¶ 60. Prout stayed in the United States through the end of June 2014 to take care of his family, id. ¶ 61, and at the end of June, he traveled to Hong Kong at Lo's request for an internal meeting, id. ¶ 65. Once Prout arrived in Hong Kong, however, Lo canceled the meeting, ostensibly because the report that Prout had prepared for the meeting contained formatting errors. Id. ¶ 69. Prout testified that Lo yelled at him and that when Prout updated Lo on his family situation, Lo responded: "I certainly hope Chessy learns better judgment in the future." Prout Dep. 114:18-20.

Shortly thereafter, Prout emailed Vladeck: "SOS from HK. Need your advice. . . . Pls also send retainer agreement." ECF No. 119, Ex. Q, at 2. On July 3, 2014, Prout executed an engagement letter with Vladeck "regarding an exit strategy with Invesco." ECF No. 119, Ex. T. After Prout attempted unsuccessfully to personally negotiate a severance package with Invesco, Prout 56.1 Counterstatement ¶ 83, Vladeck, on August 4, 2014, emailed individuals at Invesco to advise them that VRC represented Prout regarding "his claims of, inter alia, retaliation for raising concerns about potentially unlawful conduct; retaliation for taking family leave; and claims

4

relating to the inappropriate conduct of his immediate supervisor," id. ¶ 84.

In mid-August 2014, Prout requested Family and Medical Leave Act ("FMLA") leave to take care of his family, which Invesco approved through October 31, 2014. Id. ¶¶ 94-96. A few weeks before Prout was scheduled to come back to work, he was notified that he should report to Invesco's Atlanta headquarters when he returned. Id. ¶ 99. When Prout reported on November 3, 2014, however, he was informed by Invesco that he had "two options: (1) resign and receive approximately $1.13 million in compensation, stock vesting, and dividends; or (2) be fired for cause and receive approximately $71,000 in compensation." Id. ¶¶ 100-01. After consulting with Vladeck, Prout chose to let Invesco's offer expire, and he was terminated effective November 20, 2014. Id. ¶¶ 107-08. Prout testified that Vladeck told him, in substance: "Alex, don't settle. I'll get you everything that Invesco owes you and in addition Invesco will pay my legal fees." Prout Dep. 167:4-6.

On December 2, 2014, Prout met with attorneys at VRC to discuss potential claims against Invesco. Prout 56.1 Counterstatement ¶ 109. Vladeck's notes from the meeting contain references to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), the Sarbanes-Oxley Act ("SOX"),

and the Foreign Corrupt Practices Act ("FCPA"), ECF No. 131, Ex. 14, at 5, and VRC's billing records from that day indicate that one of the firm's clerks "researched venue issues under FCPA, Dodd Frank, and Sarbanes Oxley," ECF No. 119, Ex. EE, at 3. VRC did not file a SOX claim on behalf of Prout, and on May 2, 2015, 180 days after Prout's termination, any SOX claim that Prout might have had expired. Plaintiff's Local Rule 56.1(b) Statement of Additional Material Facts ¶ 80 ("Prout 56.1 Statement"), ECF No. 129; 29 C.F.R. § 1980.103(d).

In the fall of 2015, Prout started a new job with Morgan Stanley ("MS"). Prout 56.1 Counterstatement ¶ 142. On October 24, 2016, Prout informed VRC that MS had initiated an investigation into whether Prout had improperly retained proprietary documents from Invesco. Id. ¶ 143. Prout conceded to VRC that he had retained Invesco documents without authorization after his employment there ended. Id. ¶ 148. On October 26, 2016, Prout met with his superior and compliance investigators at MS, and during the meeting he denied having hard copies of the relevant documents at his office. Id. ¶¶ 154, 157. Although Prout previously did have hard copies of the documents at his office, he had removed them when he first learned of the investigation, and he subsequently destroyed them at MS's direction. Prout Dep. 237:15-238:19.

6

On October 30, 2016, Prout emailed VRC to summarize his meeting at MS, and the next day, VRC responded that "[o]ur timing has become more complicated because of these events." Prout 56.1 Counterstatement ¶¶ 155, 160. Specifically, although Prout had a potential claim against Invesco for non-willful violation of the FMLA, and the two-year statute of limitations on that claim was set to expire the following week, id. ¶ 164, VRC warned Prout that if he filed his claim now, "there was a substantial risk that Invesco would assert counterclaims against Prout relating to his theft of the proprietary information and documents," id. ¶ 165. VRC also warned Prout that such counterclaims could reveal information that might cause MS to terminate Prout, id. ¶ 166, and that if Prout sought a tolling agreement with Invesco, Invesco might pre-emptively sue him, id. ¶¶ 170-71. Based on VRC's advice, Prout chose not to pursue a non-willful FMLA claim against Invesco. Id. ¶ 180.

On June 27, 2017, Prout terminated VRC as his counsel and retained Sanford Heisler Sharp, LLP ("Sanford Heisler") – also his counsel in the instant malpractice action – to represent him in connection with his claims against Invesco. Id. ¶ 186. On August 11, 2017, Sanford Heisler sent Invesco's counsel a letter "set[ting] forth the basis for Prout's claims of FMLA retaliation, whistleblower retaliation, and wrongful

7

termination." Id. ¶ 188 (internal quotations and citations
omitted). In October 2017, Prout and Invesco agreed to submit to
mediation, id. ¶ 192, and on November 7, 2017, Prout settled all
outstanding claims against Invesco for $1.75 million, id. ¶ 204.

## **Procedural Background**

On January 11, 2018, Prout filed the instant malpractice
action against VRC. ECF No. 1. In his Second Amended Complaint
("SAC"), Prout brought a legal malpractice claim based on VRC's
failure to file Prout's SOX and non-willful FMLA claims within
the statutes of limitations. ECF No. 32, at ¶ 124. Prout also
brought a claim for breach of fiduciary duty. Id. ¶¶ 127-30.

VRC moved to dismiss the SAC, ECF Nos. 15, 23, 37, and to
disqualify Sanford Heisler as Prout's counsel, ECF No. 18. In an
Opinion and Order filed on June 11, 2018, the Court granted
VRC's motion to dismiss Prout's breach of fiduciary duty claim,
but it denied VRC's motion to dismiss Prout's FMLA- and SOX-
based malpractice claims, and it also denied VRC's motion to
disqualify Sanford Heisler. ECF No. 44, at 52.

In holding that Prout had plausibly alleged malpractice,
the Court concluded, first, that the SAC "adequately support[ed]
the claim that defendants were negligent in their representation
of Prout because they let the statutes of limitations pass on
his claim for non-willful retaliation under the FMLA and for

8

retaliation under SOX." Id. at 21. Next, the Court held that the SAC adequately pled proximate causation because, inter alia, the SAC plausibly alleged that Prout would have had viable non-willful FMLA and SOX claims had 'it not been for VRC's negligence. See id. at 26-29, 32-38. Finally, the Court held that the SAC adequately pled damages because Prout alleged that VRC initially told him his claims were worth $3 million, and this value was reduced by the lapsed statute of limitations. Id. at 40-42.

VRC moved for reconsideration, arguing that the Court had not properly analyzed Prout's allegations of proximate causation because, VRC argued, a party that settles can recover for legal malpractice only where the settlement was "effectively compelled by the mistakes of counsel." ECF No. 47, at 5. VRC argued that the Court incorrectly applied the law by requiring only that Prout show that he could have settled his entire case for more in the absence of VRC's negligence. Id. at 6. The Court denied VRC's motion, and it clarified that the relevant question was whether VRC's "negligence caused Prout to suffer a loss relating to his non-willful FMLA and SOX claims." ECF No. 67, at 7 (emphasis added). Given that the claims were time barred, the Court held, Prout was "effectively compelled" to settle them on any interpretation. Id. at 6-7.

9

On July 9, VRC brought a third-party action for contribution against Sanford Heisler, which negotiated Prout's settlement with Invesco, and Steven J. Kelly, who represented Prout in a lawsuit arising out of his daughter's sexual assault. ECF No. 48. The third-party defendants moved to dismiss, ECF Nos. 70, 74, and the Court granted the motions, ECF No. 96.[1]

Finally, on August 17, VRC filed an Amended Answer[2] to the SAC with counterclaims for breach of contract, quantum meruit, and a charging lien. ECF No. 80. Prout moved to dismiss the charging lien counterclaim to the extent that it exceeded the amount that VRC claimed in quantum meruit, ECF No. 88, and the Court granted the motion, ECF. No. 100. On September 5, Prout filed an answer to VRC's counterclaims. ECF No. 91.

Now before the Court is VRC's motion for summary judgment. ECF No. 118. VRC argues that: (1) Prout cannot establish that

---

[1] The Court initially dismissed VRC's claims against both third-party defendants with prejudice. ECF No 96, at 34. However, VRC moved for reconsideration on the grounds that the Court had found that it lacked personal jurisdiction over Kelly, and that the dismissal as to Kelly therefore should have been without prejudice. ECF No. 101. The Court granted VRC's motion, and VRC's claim against Kelly accordingly was dismissed without prejudice. ECF No. 108.

[2] VRC's initial Answer was filed on June 25, 2018. ECF No. 45. However, Prout filed a motion to strike portions of the Answer, ECF No. 55, which the Court granted in part and denied in part, ECF No. 79.

10

VRC was negligent in letting the statute of limitations lapse on his SOX and non-willful FMLA claims, see Memorandum of Law Submitted in Support of Defendants' Motion for Summary Judgment, Dismissing Plaintiff's Second Amended Complaint 3-10 ("VRC SJ Mem."), ECF No. 121; (2) Prout cannot demonstrate that he would have prevailed on either of his time-barred claims, see id. at 11-20; and (3) Prout cannot prove actual and ascertainable damages, see id. at 20-25. Prout opposes. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Prout SJ Opp."), ECF No. 128.

As noted above, this Court held oral argument on March 19, 2019, and it issued a "bottom-line" Order on March 26, 2019, in which it denied defendants' motion in its entirety. ECF No. 140. This Opinion sets forth the reasons for the Court's ruling.

## Analysis

### I.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor

11

of a non-movant that no reasonable trier of fact could find in favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).[3]

"A legal malpractice claim under New York law contains three elements: (1) the negligence of the attorney; (2) proximate cause; and (3) damages. To establish the elements of proximate cause and damages, a plaintiff must show that but for the defendant's negligence, he or she would have prevailed in the underlying action or would not have sustained any damages. For defendants in a legal malpractice action to succeed on a motion for summary judgment, evidence must be presented establishing that the plaintiff is unable to prove at least one of these essential elements of a malpractice cause of action." Allianz Ins. Co. v. Lerner, 416 F.3d 109, 118 (2d Cir. 2005).

## II. Whether VRC Was Negligent

"In order to establish negligence in a legal malpractice case, a plaintiff must allege that the attorney's conduct fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession." Kirk v. Heppt, 532 F. Supp. 2d 586, 592 (S.D.N.Y. 2008). "Generally, an attorney may

---

[3] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

12

only be held liable for ignorance of the rules of practice, failure to comply with conditions precedent to suit, or for his neglect to prosecute or defend an action." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006). The "selection of one among several reasonable courses of action does not constitute malpractice." Rosner v. Paley, 481 N.E.2d 553, 554 (N.Y. 1985).

## A. Prout's SOX Claim

VRC argues that Prout cannot establish negligence based on VRC's failure to bring Prout's SOX claim within the statute of limitations. See VRC SJ Mem. 4-6. First, VRC argues that "Prout never wanted to be perceived as a whistleblower," and that "Prout's comments to Vladeck during the early stages of [VRC's] representation left Vladeck with the distinct impression that Prout viewed filing a whistle blower claim as a 'nonstarter.'" Id. at 4. Second, VRC argues that it always believed "that Prout's 'whistleblower' retaliation claim, to the extent he even had one and ever wanted to sue, could be pursued to equal if not greater effect via [Dodd-Frank], which had a six-year statute of limitations." Id. at 5. Although the Supreme Court ultimately held in Digital Realty Trust, Inc. v. Somers that Dodd-Frank does not cover internal whistleblowers like Prout, 138 S. Ct. 767, 772-73 (2018), VRC argues that "numerous district courts

13

within the Second Circuit and elsewhere had" come to the opposite conclusion at the time VRC chose not to prosecute Prout's SOX claim, VRC SJ Mem. 5. As such, VRC argues, it was reasonable to pursue only the Dodd-Frank claim. Id. at 6.

Beginning with VRC's argument that Prout never wanted to be perceived as a whistleblower, the Court finds that there is ample evidence to the contrary. For example, shortly before the statute of limitations expired on his SOX claim, Prout sent an email to VRC in which he wrote: "Someone recently asked me 'how I liked throwing away my career for a bottle of wine' . . . I would do it again in a heartbeat." ECF No. 131, Ex. 13. Furthermore, when asked at his deposition whether he had told "Vladeck that [he] did not want to assert a whistle blower claim," Prout responded "absolutely not," and that he "wouldn't hesitate at all to pursue this." Prout Dep. 101:14-19, 102:19-20. Prout's willingness to be perceived as a whistleblower is further supported by an August 4, 2014 email that Vladeck sent to Invesco, in which she stated that VRC represented Prout regarding "his claims of, inter alia, retaliation for raising concerns about potentially unlawful conduct." ECF No. 119, Ex. X. Indeed, VRC's 30(b)(6) witness, Valdi Licul, more or less conceded that this language referred to whistleblower activity. VRC Dep. 104:14-16, 20-24, ECF No. 119, Ex. D.

14

Moving to VRC's contention that it reasonably chose to pursue a Dodd-Frank claim rather than a SOX claim, the Court finds that VRC has not demonstrated the absence of a triable issue. Even if some courts had held as of May 2015 that Dodd-Frank covered internal whistleblowers like Prout, it was nevertheless the case that "Prout's Dodd-Frank claim rested on shaky grounds" because of inter-Circuit disagreement. Prout v. Vladeck, 316 F. Supp. 3d 784, 805 (S.D.N.Y. 2018). Moreover, Prout's expert, Edward Mazurek, opined in his report that VRC's strategy was unreasonable and that, "[p]articularly where the state of the law with respect to some claims is unsettled, it is important to preserve those claims that are on the strongest legal footing." Mazurek Rep. 7-8, ECF No. 131, Ex. 11. These are genuine disputes to resolve at trial, and they preclude the Court from granting summary judgment for VRC on the issue of whether its handling of Prout's SOX claim was negligent.

## B. Prout's Non-Willful FMLA Claim

VRC also argues that Prout cannot establish negligence based on VRC's failure to bring Prout's non-willful FMLA claim within the statute of limitations. See VRC SJ Mem. 6-10. VRC contends that it was "preparing to file an action against Invesco within the two-year statute of limitations for non-willful FMLA claims," but that it learned on the eve of the

15

filing deadline that "Prout's then-employer, Morgan Stanley, had launched an investigation into whether he had improperly retained proprietary information and documents from Invesco following his termination." Id. at 7. During this investigation, VRC argues, Prout admitted to retaining proprietary information, and he "provided answers that were deceitful, if not outright false." Id.

VRC argues that it immediately convened a phone call with Prout when it learned this information, and that it "explained all the possible 'pros and cons' of commencing an action against Invesco or seeking a tolling agreement from Invesco before the non-willful FMLA limitations period expired." Id. at 8. VRC "recommended against commencing suit or seeking a tolling agreement, citing the substantial risk that Invesco would counterclaim (in the event of a lawsuit) or sue Prout first (if presented with a tolling agreement)." Id. VRC also cautioned that MS might fire Prout if it learned that he had not been truthful during their investigation. Id.

VRC states that it advised Prout that he would retain a viable willful FMLA claim even if he did not pursue his non-willful FMLA claim, and it "made clear to Prout that [VRC] [was] ready to request a tolling agreement from Invesco or commence a lawsuit against Invesco before the two-year statute of

16

limitations expired, if Prout chose either of those options."
Id. at 9. However, VRC argues, Prout chose to defer litigation
against Invesco because he was worried about the risk of losing
his job at MS. Id. at 10. Given the risks that Prout faced if he
pursued his non-willful FMLA claim, VRC concludes, it was
reasonable to let the statute of limitations expire. Id.

The Court agrees that if this were the whole story, VRC
would be entitled to summary judgment on the issue of whether it
negligently handled Prout's non-willful FMLA claim. Prout argues
that the costs of adverse action by Invesco did not outweigh the
benefits of filing his non-willful FMLA claim or seeking a
tolling agreement, see Prout SJ Opp. 11, but this is a classic
question of strategy, and the "selection of one among several
reasonable courses of action does not constitute malpractice."
Rosner, 481 N.E.2d at 554. Prout also argues that VRC was
unprepared to file a complaint against Invesco, and that VRC was
negligent for failing to review the documents at issue in the MS
investigation, Prout SJ Opp. 11, but he does not offer enough
evidence to create a triable issue on either of these points.

The Court must deny VRC summary judgment, however, because
its recounting above is not the whole story. As Prout explains,
after VRC's initial settlement negotiations with Invesco failed
in November 2014, VRC waited to reengage Invesco until October

17

20, 2016, two weeks before the statute of limitations expired on Prout's non-willful FMLA claim. Prout SJ Opp. 6. Furthermore, Prout lists nearly thirty occasions between January 4, 2015 and October 18, 2016 on which he "prodded Defendants to reengage Invesco," to no avail. Id. at 6-7. On September 19, 2016, for example, Prout told VRC: "I am concerned about SOL for our case and how to proceed to reach conclusion with Invesco." ECF No. 131, Ex. 64, at 3. And on October 6, he wrote: "Checking in to see if you were able to connect with Invesco. Pls let me know what the plan is to avoid the SOL issue should Invesco respond negatively. Are you ready and have capacity to keep this on track or should [I] prepare back up plan?" ECF No. 131, Ex. 68. When VRC finally contacted Invesco, it was unable to resolve Prout's claims, and shortly thereafter, Prout informed VRC that MS had opened its investigation. Prout 56.1 Statement ¶¶ 122, 125. It was only at this juncture, days before the statute of limitations was set to expire on Prout's non-willful FMLA claim, that VRC advised Prout to let the claim lapse.

With the history fleshed out to include the above evidence of unresponsiveness and delay, the Court finds that there is a genuine dispute as to whether VRC's conduct fell within the range of "reasonable courses of action" that would immunize it from malpractice liability. Rosner, 481 N.E.2d at 554. A

18

reasonable jury could agree with Prout's expert's opinion that "it was unreasonable for Defendants to wait until the fall of 2016 to take the first steps towards re-engaging with Invesco and possibly initiating a lawsuit based on Mr. Prout's FMLA claims." Mazurek Rep. 9; see Bonilla v. Abbott, 493 N.Y.S.2d 592, 594 (2d Dep't 1985) (concluding that a reasonably jury could find legal malpractice defendants were negligent in handling of wrongful death action because defendants "fail[ed] to proceed promptly, for no apparent reason, thereby risking and ultimately forfeiting the rights and interests of" decedent's beneficiaries).

For these reasons, the Court denied summary judgment for VRC on the issue of whether it negligently handled Prout's non-willful FMLA claim.

## III. Whether Prout Lost Meritorious Claims

"In order to demonstrate proximate cause, [a] plaintiff must establish that but for the attorney's negligence, [the] plaintiff would have prevailed in the matter in question or would not have sustained any ascertainable damages." Schwartz v. Olshan Grundman Frome & Rosenzweig, 753 N.Y.S.2d 482, 486 (1st Dep't 2003). "A plaintiff claiming legal malpractice must meet a case within a case requirement, and must demonstrate that a reasonable fact-finder [in this case] could conclude that a

19

reasonable fact-finder in the underlying suit would have arrived at a different result but for the attorney's negligence." Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP, No. 12 Civ. 9459 (PAE), 2013 WL 3357921, at *6 (S.D.N.Y. July 2, 2013), aff'd, 552 F. App'x 79 (2d Cir. 2014).

## A. Prout's SOX Claim

"Section 806 of SOX provides whistleblower protection for employees of publicly traded [companies]. To succeed in making a prima facie case under this provision, an employee must prove by a preponderance of the evidence that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." Prout, 316 F. Supp. 3d at 803.

VRC argues that Prout would not have prevailed on a SOX claim "because (1) Prout's admissions during his deposition show that he did not engage in protected activity; and (2) even if he did, there is no evidence to demonstrate that the alleged protected activity was a contributing factor in Invesco's subsequent termination of Prout's employment." VRC SJ Mem. 11.

With respect to protected activity, VRC argues that SOX protects only those who report what they reasonably believe to

20

be violations of federal law. Id. at 12. In the SAC, Prout alleges that he believed Sato's gift of a $4,000 bottle of wine constituted an FCPA violation. SAC ¶ 69. But, VRC argues, Prout testified in his deposition that "he believed Sato's alleged conduct may have violated Invesco's own rules and internal guidelines, as well [as] the rules and regulations of Japan when it comes to client entertainment." VRC SJ Mem. 12 (internal quotations and citation omitted). Because Prout sought only to report violations of foreign law, VRC argues, his activity was not protected under SOX. Id. at 13.

On the issue of causation, VRC argues that Prout cannot establish that Invesco retaliated against him for reporting Sato's gift. Id. at 14. VRC claims that Balachandra's alleged comment that Lo would "s[---] on [Prout's] head" - in addition to being hearsay - is only "a stray remark," and VRC contends that "Prout has failed to produce any evidence that Balachandra played any role in the decision to terminate Prout's employment." Id. at 14-15 (internal quotations and citation omitted).

Furthermore, VRC argues, despite his allegation that "Lo grew increasingly hostile towards Prout almost immediately after he reported" Sato's gift, SAC ¶ 73, "Prout admitted during his deposition that his relationship with Lo had been strained for

at least several months prior to the conversation during which Prout allegedly made his complaint to Lo." VRC SJ Mem. 15 (emphasis omitted). VRC argues that Lo had previously demoted Prout and given Prout a poor performance review, and it argues that - notwithstanding Prout's confrontation with Lo in June 2014 - Prout acknowledged that Lo had a reputation for temper tantrums. Id. at 16. Finally, VRC argues that there is no evidence that Invesco had a negative reaction to Prout's reports given that Invesco quickly commenced and completed its own internal investigation of the matter. Id. at 17. "Without evidence of retaliatory animus," VRC concludes, "Prout is left to rely on temporal proximity alone," and Prout was terminated nearly seven months after reporting to Balachandra and Lo. Id. at 18.

Beginning with VRC's argument that Prout did not engage in protected activity, there is ample evidence in the record that Prout believed he was reporting an FPCA violation. Before he even retained VRC, Prout emailed Vladeck: "Potential FCPA and local Japan regs violations are swept under the rug and I am placed to the sidelines." ECF No. 119, Ex. Q, at 2. Furthermore, Vladeck's notes from a July 14, 2014 meeting with Prout reference "an FCPA issue." ECF No. 119, Ex. U, at 3. And in an August 2, 2017 email to Sanford Heisler that summarized VRC's

22

representation of Prout, Vladeck wrote that Prout had initially said that Sato "bragg[ed] about buying an expensive wine outside the FCPA guidelines." ECF No. 131, Ex. 43, at 2. Even Invesco stated, in a September 7, 2017 letter to Sanford Heisler, that it understood Prout to be raising an FCPA violation. ECF No. 119, Ex. ZZ, at 2. Given this evidence, the Court finds that there is a triable issue as to whether Prout believed he was reporting a violation of federal law.

Moving to causation, the Court need not wade into the parties' debate over the relevance and admissibility of Balachandra's graphic (albeit metaphoric) comment to Prout. Instead, Prout's testimony regarding Lo's reaction to the report of Sato's gift - along with the temporal proximity of Prout's termination to the report - is sufficient to create a triable issue as to retaliation. In his declaration in opposition to summary judgment, Prout concedes that he and Lo did not always get along, but he states that their prior disagreements "were always professional and short-lived." Prout Decl. ¶ 16, ECF No. 131, Ex. 6. After Prout reported Sato's gift, however, his relationship with Lo "changed quickly and dramatically." Id. Lo "became cold and stopped speaking to" Prout, and when Prout "tried to initiate conversations about work or even engage in

23

small talk, [Lo] would glare at [Prout] or respond in just one or two words." Id.

Prout reported Sato's gift to Lo in May 2014, and Prout was out of the office from late May to late June. Prout SJ Opp. 18. When Prout returned to Hong Kong at Lo's request for an internal meeting, Prout testified that Lo's first interaction with him was to yell that "the f[------] format on this report is not correct." Prout Dep. 112:16-17. Prout stated in his declaration that "[t]his was the first time that [Lo] had ever cursed at [him] or spoken to [him] in such a tone," Prout Decl. ¶ 21, and Prout also testified that when he subsequently updated Lo on his family situation, Lo responded that he "hope[d] Chessy learns better judgment in the future," Prout Dep. 114:18-20.

Based on the above evidence of Lo's sudden dissatisfaction with Prout, a reasonable jury could find that Prout's report of Sato's gift motivated the decision to terminate him. Moreover, while it is true that Lo gave Prout a performance rating of "Needs Improvement / Developing" in the "Overall Performance Category," as well as in several other categories, see ECF No. 119, Ex. K, at 3-6, 8-10, it is also true that Lo made positive comments, including that Prout "has strong competencies," "is a senior executive with substantial regional & global experience," and "is a strong business driver," id. at

24

9. Even if Prout's performance record was checkered, this does not preclude him from showing retaliation under SOX. Instead, Prout "need only establish that whistleblower retaliation was a contributing factor to [his] termination," Feldman-Boland v. Stanley, No. 15-cv-6698, 2016 WL 3826285, at *3 (S.D.N.Y. July 13, 2016), not that it was the sole factor.

The conclusion that Prout has created a triable issue as to retaliation is bolstered by the temporal proximity of Prout's termination and his reporting of the gift. Contrary to VRC's calculation, Prout was terminated six months, not seven months, after he reported the gift to Lo. See Prout 56.1 Statement ¶¶ 12, 16, 19 (reported in early May 2014); id. ¶ 56 (was notified of his termination on November 3, 2014). Furthermore, Prout has put forth evidence that Lo intended to fire him months earlier, see ECF No. 131, Ex. 21, at 3, and even the six-month period does not account for the time that Prout was out of the office between late May and late June, or the FMLA leave that he took between August and October. Finally, as Prout notes, even if six months were the relevant period, the Second Circuit has found retaliation based on longer lapses. See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) ("the passage of only six months between the dismissal of [the plaintiff's] lawsuit" – which had been filed one year prior – "and an allegedly

25

retaliatory beating by officers, one of whom . . . was a defendant in the prior lawsuit, is sufficient to support an inference of a causal connection" between the beating and the plaintiff's protected activity); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (passage of eight months between protected activity and disfavored treatment gave rise to an inference of retaliation).

For these reasons, the Court denied summary judgment to VRC on the issue of whether Prout's SOX claim would have been meritorious.

## B. Prout's Non-Willful FMLA Claim

"To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 429 (2d Cir. 2016).

VRC argues that Prout would not have prevailed on a non-willful FMLA claim because he cannot establish retaliatory intent. VRC SJ Mem. 19. As noted above, VRC argues that, "[b]y the time Prout went on FMLA leave in August 2014, his career path at Invesco was on a decidedly downward trajectory." Id.

26

Furthermore, VRC argues that "Prout had effectively stopped coming to work before he went out on FMLA leave." Id. at 20. And finally, VRC contends, "Prout cannot prove that the legitimate, nondiscriminatory reason Invesco proffered for termination (poor performance) was pretextual, or even that Prout's taking FMLA leave was a factor in Invesco's decision to terminate his employment." Id.

As Prout explains, however, VRC's "own papers contradict [its] argument that Prout has no viable FMLA claim." Prout SJ Opp. 20. Specifically, VRC "admit[s] to advising Prout not only that his FMLA claim was viable, but that it was so strong that he should waive a non-willful claim and rely on a willful one." Id. And VRC's moving papers concede that defendants "advised Prout that it was their opinion that his FMLA retaliation claim could remain viable for another year under the statute of limitations for a willful claim." Id. (quoting VRC SJ Mem. 9).

Furthermore, there is evidence in the record to support each element of Prout's non-willful FMLA claim. As Prout notes, there is no question that he engaged in protected activity by taking approved FMLA leave. Id. at 21. And it is clear that he suffered adverse employment action given that he was fired the day he returned. Id. Finally, even Vladeck acknowledged during her deposition that Prout's firing was "retaliatory" and that

27

the FMLA gave Prout "real recourse." Vladeck Dep. 166:14-22, ECF
No. 119, Ex. F.

Based on this evidence, the Court has no trouble concluding
that Prout has created a triable issue as to retaliation, and
summary judgment on the viability of his non-willful FMLA claim
is accordingly unwarranted.

## IV.  **Whether Prout Suffered Actual and Ascertainable Damages**

"A plaintiff who brings a legal malpractice claim must show
that he or she suffered actual and ascertainable damages."
Schutz, 2013 WL 3357921, at *7. "Mere speculation about a loss
resulting from an attorney's poor performance is insufficient to
sustain a prima facie case of legal malpractice." Antokol &
Coffin v. Myers, 819 N.Y.S.2d 303, 306 (3d Dep't 2006).

VRC argues that "Prout's theory of damages is based on the
allegation that the 'loss' of his SOX claim and non-willful FMLA
retaliation claim cost him 'substantial leverage' in settlement
negotiations with Invesco and 'effectively compelled' him to
settle 'for considerably less money' than he otherwise would
have." VRC SJ Mem. 21 (quoting SAC ¶¶ 120-21). VRC rejects this
theory and argues that "Prout admitted during his deposition
that, after he retained Sanford Heisler, he chose to settle with
Invesco because he was 'fatigued' . . . and just wanted to 'move
on.'" Id. (citation omitted). Furthermore, VRC contends, Prout

"failed to pursue any discovery from Invesco during the course of this litigation," and, as a result, "there is no evidence in the record to support the allegation that Prout could have extracted a larger settlement from Invesco if his non-willful FMLA and/or SOX claim had remained viable." Id. at 22. Instead, VRC argues, Invesco had myriad defenses to Prout's claims aside from their being time barred. Id. at 23-24.

Prout responds that he "was effectively compelled to settle his lapsed FMLA and SOX claims because . . . these claims had no value." Prout SJ Opp. 22. Prout argues that Vladeck told him she would "get [him] everything that Invesco owe[d] [him] and in addition Invesco [would] pay [her] legal fee," and he argues that he "understood, based on his discussions with Vladeck, that this amount would equal $3 to 4 million - or $1.25 to $2.25 million [more] than he ultimately received." Id. at 23. While VRC argues that Prout settled all his claims because of "fatigue," Prout responds that he was effectively compelled to settle only his non-willful FMLA and SOX claims. Id. at 23-24. Furthermore, Prout argues, although Invesco asserted other defenses, "the fact that alternative explanations may exist for Invesco's resistance to paying a larger sum does not undercut that the expiration of the statute of limitations was one of them, nor that a jury could infer that it was the dispositive

29

one." Id. at 24. Finally, Prout cites Mazurek's opinion that "it was critical to maintain as many viable claims as possible to maximize . . . leverage." Id. (quoting Mazurek Rep. 7).

The Court agrees that Prout has raised a triable issue as to damages. It is irrelevant whether Prout chose to settle his remaining viable claims because he was "fatigued." Instead, his damages are measured by the loss in value of his time-barred claims. As this Court previously explained, "[f]or purposes of alleging damages, the relevant question is . . . whether Prout would have been better off if he had pursued all four of his claims, rather than pursuing only two." Prout v. Vladeck, 319 F. Supp. 3d 741, 746 (S.D.N.Y. 2018). Mazurek's opinion, Prout's testimony, and common sense all suggest that the answer is yes, and this is enough for a reasonable jury to find that Prout suffered damages.

## Conclusion

In sum, the Court concludes that Prout has created a triable issue as to each element of his malpractice claim. For these reasons, the Court, in its Order of March 26, 2019, denied VRC's motion for summary judgment in its entirety.

SO ORDERED.

Dated:   New York, NY
         April 16, 2019                    JED S. RAKOFF, U.S.D.J.

30